**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**MARCELLA J. BLEVINS,**

      **Plaintiff,**

**v.**                            **Case No.: 5:15-cv-14240**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the court are Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 10), and Defendant's Brief in Support of Defendant's Decision, (ECF No. 11), wherein Defendant requests that judgment be entered in her favor.

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 10); **GRANT** Defendant's

request to affirm the decision of the Commissioner, (ECF No. 11); and **DISMISS** this action from the docket of the Court.

## I.  <u>Procedural History</u>

On March 13, 2012, Plaintiff Marcella J. Blevins ("Claimant") protectively filed an application for DIB, alleging a disability onset date of December 1, 2011 due to bulging disc, pinched nerves, depression, arthritis, and an unidentified complaint regarding her hip. (Tr. at 476-480). On February 4, 2013, Claimant amended her disability onset date to April 1, 2011. (Tr. at 488). In her telephone interview, she clarified that she complained of hip pain; she further stated that she suffered from right leg pain, hypertension, neuropathy, panic attacks, anxiety, Tarlov cystis on the spine, seizures, and transient ischemic attacks. (Tr. at 502).

The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 405-09, 413-19). Claimant filed a request for an administrative hearing, (Tr. at 420-21), which was held on February 4, 2014, before the Honorable Geraldine H. Page, Administrative Law Judge ("ALJ"). (Tr. at 349-74). By written decision dated April 11, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 328-48). The ALJ's decision became the final decision of the Commissioner on September 8, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Thereafter, Claimant moved for judgment on the pleadings, and both parties filed memoranda in support of judgment in their favor. (ECF Nos. 10, 11, 12).

Consequently, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 49 years old on the date of her alleged onset of disability and 50 years old on the date that she last met the insured status requirements of the Social Security Act. (Tr. at 333). She has a high school education and communicates in English. (Tr. at 501-03). Claimant has previously worked as a cashier and stock person, home care provider, and telemarketer. (Tr. at 503).

## III.   <u>Summary of the ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded

benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through May 31, 2012.[1] (Tr. at 333, Finding No. 1). At the first step of the sequential evaluation, the ALJ

---

[1] Relying on a single computer entry in an agency record, Claimant suggests that her date last insured ("DLI") was 06/14—not May 31, 2012, the date used by the ALJ in her analysis and decision. (ECF No 10 at 2). However, the computer entry relied upon by Claimant appears to be in error, and the DLI used by the ALJ appears to be correct given the other agency records in evidence referencing Claimant's DLI, all of which confirm the date to be May 31, 2012. (*See* Tr. at 2, 375, 389, 390, 396, 404, 405, 414, 418, 443, 450, 464, 489, 537, 563). In any event, as the Commissioner notes, Claimant has waived any argument regarding the DLI, because she failed to properly raise it. (*See* ECF No. 11 at 3).

confirmed that Claimant had not engaged in substantial gainful activity since April 1, 2011, her alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "seizure disorder; degenerative disc disease of the lumbar spine; fibromyalgia; degenerative changes in the hips; bursitis in the left shoulder; slight to mild sensorineural hearing loss, bilaterally; and cervical radiculopathy and cervicalgia." (Tr. at 333, Finding No. 3). The ALJ considered Claimant's hyperlipidemia; foot, leg, and elbow pain; upper respiratory infections; hypertension; dizziness; headaches; depressive and anxiety disorder; and cognitive disorder, singly and in combination, and found them to be non-severe conditions. (Tr. at 334).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 335, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) except the claimant would be capable of lifting/carrying 20 pounds occasionally and 20 pounds frequently; standing/walking 6 hours in an 8 hour work day; sitting for 6 hours in an 8 hour work day; occasionally pushing/pulling with upper extremities; and frequently reaching overhead. However, the claimant would be precluded from work involving crawling, and climbing ladders, ropes, or scaffolds, and must avoid concentrated exposure to temperatures. The claimant would additionally require work involving no exposure to hazardous machinery, unprotected heights, or vibrating surfaces and with no required driving or exposure to excessive noise.

(Tr. at 336, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform her past relevant work. (Tr. at 341, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful

activity. (Tr. at 341-43, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1962 and was defined as a younger individual on the alleged disability onset date, but changed age category to closely approaching advanced age; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of transferable job skills. (Tr. at 341, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy, including work as marker, counter clerk, and assembler at the light exertional level. (Tr. at 342, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 343, Finding No. 11).

## IV.    Claimant's Challenges to the Commissioner's Decision

For her sole challenge to the Commissioner's decision, Claimant asserts that the ALJ failed to adequately consider Claimant's cognitive disorder at the various steps of the disability evaluation process. (ECF Nos. 10, 12). Specifically, Claimant argues that the ALJ only "mentioned in passing" Claimant's cognitive impairment at step two of the process, and failed to analyze the disorder under Listing 12.02 (Organic Mental Disorders) at step three. (ECF No. 10 at 10). Claimant further argues that the ALJ did not consider Claimant's cognitive impairment in determining her RFC despite opinions from medical sources identifying functional limitations related to that condition.

In response, the Commissioner contends that the ALJ appropriately determined that Claimant's cognitive disorder was not severe at step two of the disability evaluation

process. Therefore, the ALJ was not required to specifically discuss Listing 12.02 at the third step. (ECF No. 11). In addition, the Commissioner argues that the RFC adequately addressed Claimant's non-severe cognitive disorder in light of all of the evidence of record. (*Id.*).

## V.   Relevant Medical History

The undersigned has reviewed the entire Transcript of Proceedings. However, only the medical records and opinion evidence most relevant to this PF & R are summarized as follows.

### A.  Treatment Records

On May 15, 2009, Claimant presented to Southern Highlands Community Mental Health Center ("Southern Highlands") for voluntary mental health treatment. (Tr. at 610). She stated that she had taken antidepressants as a teenager due to suicidal thoughts. Approximately three months earlier, Claimant had been prescribed Klonopin by Dr. Mike Mascara at Oceana Family Health Care Clinic. (Tr. at 611). Claimant reported that she was in a depressed mood and nervous every day, cried a lot, had anxiety attacks, had problems sleeping, was irritable, and experienced mood swings. (*Id.*). Her back and hip pain caused her a lot of stress and discomfort, and she felt hopeless; helpless; worthless, at times; and experienced poor memory and concentration. (*Id.*).

Regarding her medical history, Claimant reported suffering a stroke eight months prior, but did not think it was confirmed by a physician. (*Id.*). She stated that she did not have friends or a support system and mentioned that her husband was jealous and "would not let her do a lot of things." (*Id.*). She enjoyed "play[ing] on the computer." (*Id.*). Rebecca Payne, the nurse completing Claimant's intake, noted in the

intake assessment that Claimant was alert and oriented to person, place, surroundings, and the date, but her recent and remote memory and concentration were poor. (Tr. at 611-12). Claimant's self-concept, insight, and judgment were good and she appeared to be of average intellectual functioning. (Tr. at 612).

Later that month, on May 28, 2009, Claimant underwent a psychiatric evaluation at Southern Highlands by Nichole Horsford, M.D. (Tr. at 604). Claimant reported that she had a grand mal seizure on the previous Halloween and that she had one prior grand mal seizure fifteen years ago. (*Id.*). She stated that she was confused for four weeks after the seizure on Halloween and suffered short-term memory loss since that time. (*Id.*). She reported stress due to her seizure disorder, "wanting out" of her twenty-nine-year marriage, and seeking social security benefits. Claimant also discussed her memory problem and chronic back pain. (*Id.*). She attributed problems in her marriage to her short-term memory loss, which caused her husband to become irritated with her. (*Id.*).

Dr. Horsford performed a mental status examination of Claimant. Claimant's speech and thought content were normal; her cognitive functions were clear; her registration and immediate recalls were 4/4 at zero and five minutes; her concentration, attention, and immediate recall was unimpaired; her judgment was unimpaired; and she functioned at an average intellectual level. (Tr. at 607). She was diagnosed with a mood disorder due to general medical condition. (*Id.*). Dr. Horsford prescribed Lamictal and Neurontin and recommended a follow-up appointment in four weeks. (Tr. at 608).

Claimant had numerous follow-up visits at Southern Highlands in 2009 through 2011. (Tr. at 590-603). At these visits, her stream of thought was normal;

speech and content of thought was appropriate; her insight/judgment was good; she had full orientation to person, place, time, and situation; she had baseline cognitive functioning; and her recent memory was poor, but her remote memory was good. (Tr. at 603, 601, 600, 598, 597, 596, 595, 594).

On March 21, 2011, Claimant presented to Georgianna Richards, M.D., at Raleigh Neurology, with complaints of seizures. (Tr. at 577). Claimant stated that the seizures began 17 years earlier and that she suffered two episodes. (*Id.*). Dr. Richards observed that Claimant had a mild memory impairment, among other physical conditions. (Tr. at 579). Claimant saw Dr. Richards for a follow-up appointment approximately a month later, on April 20, 2011, noting that in addition to her prior episodes of seizure activity, she "pass[ed] out" two and a half weeks prior. (Tr. at 575). Claimant reported that she had trouble with her speech at times; she would intend to say one thing, but ended up saying the opposite. (*Id.*). On examination, Claimant was alert and oriented and her speech and language were normal. (*Id.*). Dr. Richards's impression, as related to Claimant's mental faculties, remained that Claimant had a mild memory impairment, but that Claimant also suffered from depression. (Tr. at 576).

On July 26, 2011, Claimant was discharged from Southern Highlands for lack of participation; the records reflect that she missed many appointments, including her four prior appointments. (Tr. at 590-91). Claimant did not resume treatment at Southern Highlands until November 15, 2013. (Tr. at 796). Kenneth Birchfield completed her initial clinical evaluation/ assessment summary. (*Id.*). Claimant reported being overwhelmed with her medical symptoms. She had experienced depression for several years, possibly the past 10 years, and on a daily basis for the past

9

two to three years. Claimant also reported feeling apathetic on a daily basis for the past three years, having severe hopelessness and helplessness, and an inability to concentrate for the past two years. Claimant felt anxious twice per week, with severe agitation for the past two years, sleeplessness, and paranoia for the past 9 to 10 years. (Tr. at 797). Claimant reported that her psychiatric symptoms were affecting her sociability and motivation and making her severely withdrawn. (*Id.*). On examination, Claimant was oriented to person, place, time, and situation; and her thought content, sociability, speech, and appearance were within normal limits. (Tr. at 799). She was diagnosed with recurrent, moderate major depressive disorder and generalized anxiety disorder. (*Id.*). Mr. Birchfield recommended a psychiatric evaluation. (Tr. at 801).

On December 3, 23, and 26, 2013, Claimant presented to Family Health Care Associates for various physical and mental complaints, which included anxiety and depression. (Tr. at 756, 850, 213). She was evaluated by certified physician assistants, who duly noted that Claimant was oriented to time, person, and place. (*Id.*). She was prescribed Ativan and Cymbalta. (*Id.*).

On January 16, 2014, Claimant underwent a psychiatric examination by Misty Meadows, PA-C, at Southern Highlands. (Tr. at 900-05). Claimant's mental status examination was generally normal other than the fact that Claimant had a depressed mood, reported visual hallucinations, had fair recent memory with 2/3 recall at 5 minutes, had guarded sociability, and had fair insight/judgment. (Tr. at 903). Her intelligence was judged to be average. (*Id.*). Her diagnoses were recurrent, moderate major depressive disorder, generalized anxiety disorder, and a possible mood disorder. (Tr. at 904).

Claimant saw certified physician assistants once or twice per month at Family

Health Associates from January, 2014 through March, 2014. (Tr. at 218-31). She continued to complain of anxiety and sleep disturbances. Her diagnoses regarding depression and anxiety remained the same, and she was treated with Cymbalta and/or Ativan during this period. (*Id.*). During these visits, Claimant was always oriented to time, place, and person. (Tr. at 219, 223, 226, 230).

On April 1, 2014, Claimant was evaluated by Riaz Riaz, M.D., at Southern Highlands, for follow-up and medication management. (Tr. at 326-27). Her diagnoses of recurrent, moderate major depressive disorder and generalized anxiety disorder were not changed. (Tr. at 326). Her speech, affect, and thought content were appropriate. (*Id.*). Her insight, judgment, and recent memory was good. (*Id.*). She was oriented to person, place, time, and situation. (*Id.*). Her stream of thought was normal and she had baseline cognitive functioning. (*Id.*).

On April 16, 2014, Claimant received a psychiatric evaluation at Southern Highlands from Ms. Meadows, PA-C. (Tr. at 320-25). Claimant complained of anxiety and depression and reported that she was treated for those conditions two years earlier at the Southern Highlands treatment facility in Welch, West Virginia. (Tr. at 320). Her symptoms included feeling hopeless, anhedonia, and decreased energy, appetite, and concentration. (*Id.*). Her sleeping habits varied with pain, and her moods were irritable and swinging. (*Id.*). She reported a history of invincibility and pressured speech. (*Id.*). Her last auditory hallucination was six months ago when she allegedly heard her deceased mother call her name. (*Id.*). Claimant had no recent suicidal or homicidal ideations, but had a history of suicidal ideation without attempt. She also had two psychiatric hospitalizations at Beckley Appalachian Regional Hospital. (Tr. at 320-21).

As for her medical history, Claimant related a history of grand mal seizures, loss of consciousness, and a transient ischemic attack resulting in a short-term memory deficit. (*Id.*). Claimant also reported that she had been disabled for one year. (Tr. at 323). On examination, Claimant's speech was described as "clear, easy to understand;" her thought process was goal directed; she had visual hallucinations of shadows, but no auditory hallucinations; her cognition was normal; she knew the date and was oriented to person, place, and time; her remote memory was intact; her recent memory was fair with 2/3 recall at 5 minutes, although she once stopped the interview to ask "what were we talking about?;" she was able to pay attention in the interview; her insight/judgment was fair; and her intelligence was average. (*Id.*). Claimant was diagnosed with recurrent, moderate major depressive disorder; a possible mood disorder; generalized anxiety disorder; and extensive stress concerning health issues. (Tr. at 324). Her prognosis for treatment was guarded. (*Id.*).

Claimant had various medical appointments between April 2014 and May 2015. She continued to complain of anxiety and depression, among her physical conditions, but her assessment and treatment regarding her mental conditions essentially remained the same. (Tr. at 234-54, 265-66, 273, 279, 9-10). On November 4, 2014, Claimant saw Kellie B. Vaught, MSN, FNP-BC, for low back pain, cervical radiculopathy, and paresthesias. (Tr. at 304). Ms. Vaught noted that at that visit, Claimant had no memory problems, was well-appearing and in no distress; was alert and oriented to person, place, time, and situation; and had normal speech, language, memory, concentration, attention, and fund of knowledge. (*Id.*). On February 25, 2015, Claimant reported that her physical functioning, family relationships, mood, and sleep patterns were the same, but she had a 70 percent improvement in the activities of daily

12

living. (Tr. at 36). She was still oriented to person, place, and time. (Tr. at 39). On May 14, 2015, Claimant had no memory problems, was well appearing and in no distress. (Tr. at 9-10). She was alert and oriented and had normal speech, language, memory, concentration, attention, and fund of knowledge. (*Id.*).

### B. Evaluation and Opinion Evidence

On September 11, 2012, Sunny S. Bell, M.A., evaluated Claimant for the West Virginia Disability Determination Service. (Tr. at 748-755). Claimant's chief complaints were a mini stroke and other physical conditions. (Tr. at 748). She reported that she had problems with her memory because she has seizures. (Tr. at 749). She also noted issues with depression, anxiety, and panic attacks. (*Id.*). Claimant stated that she could not work because of the pain and because she "gets so aggravated." (*Id.*).

Ms. Bell concluded that Claimant was suffering from a cognitive disorder and possibly a mini stroke, and that it was uncertain whether her condition was stable or progressive. (*Id.*). Ms. Bell noted that Claimant complained of difficulty with concentration and making decisions, and she had memory problems. (*Id.*). Ms. Bell further noted that test results were indicative of a cognitive disorder. (*Id.*). During the mental status examination, Claimant's speech was clear, goal-directed, and relevant; she was oriented to the month, year, and day of the week, but not the date; she was oriented to person, place, and circumstance; her thought processes were logical and organized; and her judgment was within normal limits. Claimant's recent memory was found to be mildly to moderately impaired as indicated by COGNISTAT. In addition, her remote memory was mildly deficient and she had some difficulty recalling history; however, her concentration was assessed as within normal limits. (Tr. at 751).

Claimant's full scale IQ was 79 on the WAIS-IV Test. (Tr. at 752). Ms. Bell believed Claimant's results to be accurate, but noted that Claimant functioned at a higher level in the past. For that reason, Ms. Bell opined that Claimant's current IQ scores were reflective of a cognitive disorder. (*Id.*). Ms. Bell noted that although the COGNISTAT scores did not indicate the presence of a cognitive disorder, the scores were not proof that Claimant did not have cognitive dysfunction. (*Id.*). Ms. Bell's diagnostic impression was that Claimant suffered from depressive disorder, panic disorder, generalized anxiety disorder, and cognitive disorder NOS. (*Id.*). Ms. Bell stated that her diagnosis of a cognitive disorder was based upon Claimant's history of grand mal seizures for years and a transient ischemic attack, Claimant's reported symptoms, and Claimant's test results. (*Id.*). Ms. Bell opined that Claimant had a poor prognosis, but noted that Claimant's pace and persistence were within normal limits. (Tr. at 754).

On October 4, 2012, John Todd, Ph.D., completed a Psychiatric Review Technique of Claimant at the initial level of her DIB claim. (Tr. at 381-82). Dr. Todd considered Listings 12.02-Organic Mental Disorders, 12.04-Affective Disorders, and 12.06-Anxiety-Related Disorders. (*Id.*). Dr. Todd found that Claimant had mild restriction in activities of daily living; no difficulties in maintaining social functioning, concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. (Tr. at 382). He found that Claimant was mostly credible, noting that she had outpatient treatment and medication, but was discontinued from treatment on July 26, 2011 due to lack of participation. (*Id.*). Dr. Todd noted that Claimant related doing better on medication and completed forms relating her physical conditions as the main issue and that she otherwise completed daily activities such as

14

managing finances, driving, shopping, taking medication, attending her granddaughter's activities, and using Facebook. (*Id.*).

On the same date, Dr. Todd completed a Mental Residual Functional Capacity Assessment, concluding that Claimant had understanding and memory limitations, but that she was not significantly limited in her ability to remember locations, work-like procedures, and very short and simple instructions. (Tr. at 385-86). However, Claimant was moderately limited in her ability to understand and remember detailed instructions. (Tr. at 385). Dr. Todd noted that Claimant was assessed as having mild to moderate deficits in recent memory functions and borderline level IQ in Ms. Bell's evaluation. (*Id.*). Dr. Todd opined that Claimant required simple repetitive type 2-3 step tasks, but that Claimant had no limitations in sustained concentration and persistence, social interaction, or adaption. (Tr. at 385-86).

On December 11, 2012, Karl G. Hursey evaluated Claimant at the reconsideration level and affirmed Dr. Todd's findings. (Tr. at 396-97, 400-01).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct

a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Claimant contends that the ALJ's decision does not demonstrate that the ALJ properly considered Claimant's cognitive impairment in the disability evaluation process; thus, Claimant states that the ALJ's ultimate decision that Claimant was not disabled under the Act is unsupported by substantial evidence. (ECF Nos. 10, 12). For the reasons that follow, the undersigned disagrees with Claimant's contention, as the ALJ's decision reflects careful and considered discussion and support from the record for her findings regarding Claimant's cognitive impairment. Therefore, the ALJ's decision is supported by substantial evidence.

When a claimant asserts a mental impairment as a basis for disability, the SSA is required to employ a "special technique," unique to mental impairments, to determine severity. *See* 20 C.F.R. § 404.1520a(a) ("[W]hen we evaluate the severity of mental impairments ... we must follow a special technique at each level in the administrative review process."). Pursuant to that technique, an ALJ "considers four functional areas essential to the ability to work: activities of daily living; ability to maintain social functioning; concentration, persistence, and pace in performing activities; and deterioration or decompensation in work or work-like settings." *Felton-*

*Miller v. Astrue*, 459 Fed. Appx. 226, 231 (4th Cir. 2011) (citing 20 C.F.R. §§ 404.1520a and 416.920a). "The ALJ's decision must show the significant history and medical findings considered and must include a specific finding as to the degree of limitation in each of the four functional areas." *Id.* (citing 20 C.F.R. §§ 404.1520a(4) and 416.920a(4)).

This "special technique" is employed at steps two and three of the sequential evaluation process to determine the severity of a claimant's mental impairments. *See Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 652–53 (6th Cir. 2009). It is a "complex and highly individualized process," which must take into account all relevant evidence bearing on the claimant's mental condition. 20 C.F.R. § 404.1520a(c)(1). In this context, relevant evidence includes "clinical signs and laboratory findings, the effects of [a claimant's] symptoms, and how [a claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.*

In general, the SSA first determines whether a claimed impairment has sufficient evidentiary support to be considered a medically determinable impairment. *Id.* § 1520a(b)(1). If the impairment is medically determinable, the next step is to assess the degree of functional limitation it creates with reference to the four functional areas listed in 20 C.F.R. § 404.1520a(c)(3) (as noted above, activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation). The SSA ranks the degree of limitation present in the first three functional areas on a five-point scale ranging from "none" to "extreme," and ranks the fourth area based on number of episodes. *Id.* § 404.1520a(c)(4). Based on its findings with respect to each

functional activity, the SSA will determine whether a claimant's medically determinable mental impairments are severe. *Id.* § 404.1520a(d). "[I]f the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function." *Miller v. Colvin*, No. 2:13-cv-31251, 2015 WL 917772, at *3 (S.D. W. Va. Mar. 3, 2015) (citing 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3)). However, a ranking of either "none" or "mild" in the first three areas coupled with no episodes of decompensation will "generally" lead the SSA to "conclude that [an] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).

In this matter, the ALJ found at step two of the sequential evaluation that Claimant had the severe impairments of "seizure disorder; degenerative disc disease of the lumbar spine; fibromyalgia; degenerative changes in the hips; bursitis in the left shoulder; slight to mild sensorineural hearing loss, bilaterally; and cervical radiculopathy and cervicalgia." (Tr. at 333, Finding No. 3). The ALJ further determined that Claimant had non-severe impairments of hyperlipidemia; foot, leg, and elbow pain; upper respiratory infections; hypertension; dizziness; headaches; depressive and anxiety disorder; and cognitive disorder.[2] (*Id.*). As an initial matter, the undersigned clarifies that the ALJ's inquiry proceeded to the third step of the sequential evaluation

---

[2] An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §§ 404.1521(a), 416.921(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, remembering simple instructions, understanding simple instructions, carrying out simple instructions, using judgment, interacting appropriately with co-workers, and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

and Claimant was not prejudiced by the ALJ's step two finding that Claimant's cognitive impairment was non-severe.

Courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not reversible error as long as the process continues and any functional effects of the impairment are appropriately considered during the later steps. *See McKay v. Colvin,* No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D.W.Va. Jun. 27, 2013); *Cowan v. Astrue,* No. 1:11-cv-7, 2012, WL 1032683, at *3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r,* Case No. SAG-12-2290, 2013 WL 1664370, at *2 (D. Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Lewis v. Astrue*, 937 F. Supp. 2d 809, 819 (S.D.W.Va. 2013) (applying harmless error standard where ALJ proceeded to step three and considered non-severe impairments in formulating claimant's RFC); *Cook ex rel A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) ("The failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue,* No. 2:08–cv–75, 2010 WL 1369107, at *6 (N.D.W.Va. Mar. 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments."); A number of federal courts of appeals have

19

agreed with this approach. *Jerome v. Colvin*, 542 F. App'x 566, 566 (9th Cir. 2013); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853-54 (11th Cir. 2013); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Schettino v. Comm'r of Soc. Sec.*, 295 F. App'x 543, 545 n.4 (3d Cir. 2008); *Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008); *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Along with the absence of any prejudice to Claimant flowing from the ALJ's step two finding as to her cognitive impairment, Claimant's challenge is unpersuasive for other reasons. First, substantial evidence supports the ALJ's conclusion that Claimant's cognitive disorder was non-severe. In her decision, the ALJ dedicated the majority of her step two discussion to Claimant's mental impairments and concluded that Claimant's cognitive disorder and other non-severe impairments, considered individually and in combination, did not cause more than a minimal limitation in her ability to perform basic mental work activities and were not of a severity to meet or equal a listing. (Tr. at 334-35).

In determining that Claimant's mental impairments were non-severe, the ALJ applied the special technique discussed above and assessed Claimant's degree of limitation in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation (Tr. at 334). Contrary to Claimant's contention that the ALJ mentioned Claimant's cognitive disorder only in passing, the ALJ specifically addressed that condition, stating:

> While the claimant had scored in the borderline range on intellectual testing with the consultative examiner, her functioning was noted to have been higher in the past; therefore, the scores were felt to be a reflection of a cognitive disorder (Exhibit 10F) rather than borderline intellectual functioning. The claimant's concentration was within normal limits. This

diagnosis has been considered in the foregoing analysis.

(Tr. at 335). The "foregoing analysis" referenced by the ALJ was the assessment of Claimant's functional deficits in the four broad categories designated as "paragraph B" criteria. Consequently, the ALJ clearly considered Claimant's cognitive disorder and evaluated its functional impact when determining severity at step two of the process.

The ALJ concluded that Claimant had mild limitations in activities of daily living and concentration, persistence, or pace and no limitation in social functioning or episodes of decompensation of extended duration. (*Id.*). In support, the ALJ cited Claimant's Adult Function reports, which listed a variety of daily activities, including maintaining personal care, preparing simple meals, doing laundry, driving, shopping for groceries, and managing the household finances. (*Id.*). The ALJ acknowledged that Claimant later reported engaging in fewer daily activities, but continued to perform basic activities without significant assistance. (*Id.*).[3] The ALJ further noted that Claimant reported regular social interaction while performing routine daily activities and the ability to get along with others if treated fairly. (*Id.*).

As part of her argument that the ALJ did not specifically address Claimant's cognitive disorder when applying the special technique for mental impairments, Claimant criticizes the ALJ's step two finding regarding the third functional area: concentration, persistence, or pace. Claimant contends that it is unclear how the ALJ determined that Claimant had only a mild limitation in concentration, persistence, or pace based on Ms. Bell's credited opinion of mild to moderate impairment in recent

---

[3] Further, although not noted by the ALJ, the earlier functional report was dated May 2, 2012, which fell within and near the end of Claimant's insured period which ended on May 31, 2012. The later functional report, which claimed a reduction in daily activities, was dated November 7, 2012, which was months after Claimant's last insured date.

memory skills. (ECF No. 10 at 12). The undersigned finds that the ALJ's decision adequately addresses this question and is supported by substantial evidence.

First and foremost, the totality of the evidence, as clearly cited and discussed by the ALJ, supports that Claimant had no more than a mild limitation in concentration, persistence, or pace. Second, even if the ALJ adopted Ms. Bell's findings *in toto*, a mild to moderate deficit in recent memory does not inevitably translate into a mild to moderate deficit in concentration, persistence, or pace; in other words, the ALJ's decision is not inconsistent with Ms. Bell's finding such that it necessitated an elaborate discussion or reconciliation of conflicting evidence.[4] Claimant isolates a single finding within Ms. Bell's opinion in an attempt to create a discrepancy which does not exist.

As stated by the ALJ, Ms. Bell diagnosed Claimant with a mild to moderate memory impairment, but determined that Claimant's concentration was within normal limits. (Tr. at 334). Further, the ALJ referenced Claimant's treatment records from Southern Highlands, which stated that Claimant's memory was fair, her intellect average, and she was oriented to person, place, and time. (*Id.*). The ALJ also recounted the state agency psychologists' findings that Claimant did not have a severe mental

---

[4] Courts seemingly disagree as to the relevance of a claimant's memory in determining ability to maintain concentration, persistence, or pace. *Compare Burns ex rel. S.M.B. v. Colvin*, No. 2:14-1288, 2015 WL 4634992, at *5 (D.S.C. Aug. 3, 2015) (stating that it may be true memory "is relevant to evaluating concentration, persistence, and pace"), *and Gray v. Colvin*, No. 3:13-cv-1944, 2014 WL 4536552, at *19 (M.D. Pa. Sept. 11, 2014) (finding that Listing 12.00(C)(3) "allows for memory to be used as a consideration in evaluating concentration, persistence, and pace"), *with Pounds v. Astrue*, 772 F. Supp. 2d 713, 729-30 (W.D. Pa. 2011) (stating that findings regarding claimant's memory did not relate to claimant's concentration, persistence, or pace); *see also* 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(C)(3) ("On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits."). The undersigned notes that a Mental Residual Functional Capacity Assessment form used by the SSA separates the category of "Understanding and Memory," from "Sustained Concentration and Persistence." Form SSA-4734-F4-SUP.

impairment. (Tr. at 335). Later in her discussion, the ALJ again discussed Ms. Bell's findings, stating that despite the fact that the intellectual testing showed a full scale IQ of 79, cognitive testing established essentially average findings with no severe deficiencies in memory, judgment, orientation, attention, repetition, and comprehension. (Tr. at 340).

The record supports the ALJ's determination that Claimant had only a mild impairment in maintaining concentration, persistence, or pace. Despite Claimant's self-reported complaints of poor memory and concentration, treatment records indicated that she suffered from, at most, mild functional limitations. Before Claimant's alleged period of disability, on May 28, 2009, Dr. Horsford found that Claimant's cognitive functions were clear; her registration and immediate recalls were four-out-of-four at zero and five minutes; and her concentration, attention, and immediate recall were unimpaired. (Tr. at 607). During her alleged period of disability, on April 20, 2011, Dr. Richards noted that Claimant's speech and language were normal, despite Claimant's report that she had trouble with her speech at times when she intended to say one thing, but said another; further, Dr. Richards found that Claimant was alert and oriented and had only a mild memory impairment. (Tr. at 576). Likewise, after Claimant's DLI, on April 1, 2014, Dr. Riaz concluded that Claimant's recent memory was good, her stream of thought was normal, and she had baseline cognitive functioning. (Tr. at 326). This longitudinal view of Claimant's treatment plainly supports the ALJ's determination that Claimant's cognitive impairment was non-severe.

Moreover, the record is devoid of a single piece of evidence from a treating medical provider within the relevant period which contradicts or in any way conflicts

with the ALJ's finding that Claimant's cognitive disorder was non-severe and posed no more than minimal functional limitations. A claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment.

Finally, the opinion evidence also supports the ALJ's decision. Despite Ms. Bell's notation of a mild to moderate memory impairment, Ms. Bell found that Claimant's concentration was unimpaired. (Tr. at 751), and the consulting agency psychologists agreed that Claimant had no limitations in sustained concentration and persistence. (Tr. at 385, 401). Therefore, the record supports the ALJ's analysis and the undersigned **FINDS** that the ALJ's determination that Claimant's cognitive disorder was a non-severe impairment is supported by substantial evidence.

The next inquiry is whether the ALJ's step three analysis is supported by substantial evidence. Claimant contends that the ALJ's decision does not demonstrate that the ALJ considered her cognitive disorder under Listing 12.02, which applies to organic mental disorders. (ECF Nos. 10, 12). As mentioned above, the ALJ determined at step two of the evaluation that Claimant's psychological impairments were not of a severity to meet or equal any listing. (Tr. at 335, Finding No. 3). At step three, the ALJ elaborated that she reviewed Claimant's impairments under the Listings, including under section 12.01, which applies to mental disorders, and found that "the current evidence fails to establish an impairment that is accompanied by signs that are reflective of listing level severity" and "in addition, none of the claimant's treating or

24

examining physicians of record reported any of the necessary clinical, laboratory or radiographic findings specified in the Listings." (Tr. at 335, Finding No. 4). The ALJ concluded that after considering all of the evidence, Claimant's impairments did not meet or equal any Listing. (*Id.*).[5] Although the ALJ did not specifically articulate her analysis of Listing 12.02 at step three of her analysis, her step two discussion and other portions of her decision demonstrate why she determined that Claimant's impairment, or combination of impairments, did not meet the Listing 12.02.

Listing 12.02 provides the following:

**12.02** *Organic mental disorders*: Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

1. Disorientation to time and place; or

2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

4. Change in personality; or

5. Disturbance in mood; or

---

[5] The ALJ stated that "although claimant's impairments are severe, they do not meet or equal any listing," but it is clear that she evaluated Claimant's non-severe mental impairments under the Listings, and not only Claimant's severe physical impairments. The ALJ identified Listings 12.01 (mental disorders), 12.04 (affective disorders), and 12.06 (anxiety related disorders) in her step three analysis. (Tr. at 335, Finding No. 4).

6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

As quoted above, for Claimant's cognitive disorder to equal the severity required in Listing 12.02, Claimant must meet either paragraphs A and B or meet paragraph C. Here, even assuming for the sake of discussion that Claimant met paragraph A of Listing 12.02, there is not a scintilla of evidence in the record that she met paragraphs B or C; indeed, the records dispel any suggestion that her cognitive impairment, alone

or in combination with her other impairments, was of the severity required in the Listing.

First, there is not a single finding in the record that Claimant had marked restriction in any of the "paragraph B" functional areas or had repeated episodes of decompensation of extended duration. In fact, the ALJ thoroughly discussed the "paragraph B" criteria at step two of her analysis and found that Claimant had only mild limitation in activities of daily living and maintaining concentration, persistence, or pace and no limitation in social functioning or repeated episodes of decompensation of extended duration. (Tr. at 334, Finding No. 3). The ALJ's "paragraph B" analysis is well-supported with citations to the record at step two and further elaborated in her RFC discussion of the state agency psychologists' findings. (*Id.*; Tr. At 340, Finding No. 5).

Second, there is no evidence that Claimant met paragraph C of Listing 12.02. As noted, the ALJ clearly considered the opinions of the state agency psychologists at step two of her evaluation and in her RFC analysis. (Tr. at 335, Finding No. 3; 340, Finding No. 5). Both consulting psychologists found that the evidence did not establish the presence of "paragraph C" criteria. (Tr. at 382, 397).

Thus, there was simply no need for the ALJ to specifically articulate her rationale at step three of the analysis with regard to Listing 12.02 because it would have been a mere recitation of other portions of her decision and because there was no evidence in the record that even suggested Claimant might meet the Listing. The ALJ already explained her "paragraph B" findings, as well as other evidence related to the criteria of Listing 12.02. The record is devoid of any question that Claimant's cognitive disorder, alone or in combination with her other impairments, met or equaled Listing

12.02. Therefore, the undersigned **FINDS** that the ALJ's step three analysis and determination that Claimant's cognitive disorder did not meet or equal a listed impairment is supported by substantial evidence.

The final issue raised by Claimant is whether the ALJ's RFC determination fully accounted for limitations related to Claimant's cognitive disorder. Claimant contends that the ALJ did not consider her cognitive impairment in the RFC determination, asserting that the ALJ should have, at a minimum, restricted Claimant's RFC to "simple repetitive type 2-3 step tasks" consistent with the opinions of the state agency consulting psychologists. (ECF No. 12 at 4).[6] The undersigned finds this argument to be without merit.

As noted above, the special psychiatric review technique is used to determine the severity of mental impairments and is not in itself an assessment of RFC. Soc. Sec. Admin., SSR 96-8P, *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims* (July 2, 1996); *see also McPherson v. Astrue*, 605 F. Supp. 2d 744, 757 (S.D. W. Va. 2009) ("Assessing the effect of mental impairments on RFC requires a much more precise analysis of a claimant's abilities than is necessary when determining the degree of the impairments' severity at step two of the sequential evaluation."); *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (noting that the special technique procedures "do not permit the ALJ to simply rely on his finding of non-severity as a substitute for a proper RFC analysis"). However, the findings an SSA adjudicator makes using the special technique are nonetheless

---

[6] The limitation to "simple repetitive type 2-3 step tasks" is the only restriction that Claimant contends should have been included by the ALJ. Claimant does not cite, nor does the undersigned find in the record, other restrictions which were potentially omitted from Claimant's RFC related to her cognitive impairment.

relevant to her ultimate RFC determination, as the adjudicator must "assess the claimant's mental RFC by translating the findings that were developed through the evaluation of the [special technique] factors into specific work-related limitations." *Grubby v. Astrue*, No. 1:09cv364, 2010 WL 5553677, at *13 (W.D.N.C. Nov. 18, 2010) (citing 20 C.F.R. § 404.1520a(c)(3) and SSR 96-8p) *report and recommendation adopted*, Civil No. 1:09cv364, 2011 WL 52865 (W.D.N.C. Jan. 7, 2011).

Logically, a mental impairment considered to be non-severe at step two of the disability process is less likely to result in specific functional limitations in the RFC finding. *See Strempel v. Astrue*, 299 Fed. Appx. 434, 439 (5th Cir. 2008) (upholding RFC determination that did not expressly account for any mental impairment where evidence in record suggested that the claimant did not have a mental condition that imposed more than minimal limitations); *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) (noting, in response to a challenge to an ALJ's step five hypothetical based solely on the fact that the hypothetical was based on an incomplete RFC, that where an ALJ finds that a limitation in concentration, persistence, or pace does not affect a claimant's ability to work, it would be "appropriate to exclude [that limitation] from the hypothetical tendered to the vocational expert"). After all, to determine that an impairment is non-severe, the ALJ must examine the impairment in terms of its impact on a claimant's ability to perform basic work activities. Moreover, although some consideration of every impairment, separately and in combination with others, is required to ascertain a claimant's RFC, an ALJ need not incorporate restrictions in the RFC to reflect a claimant's non-severe impairments when the ALJ reasonably determines such impairments do not actually result in work-related functional limitations. *See* 20 C.F.R. § 404.1545(a)(1) (defining RFC as a person's ability to

function despite the existence of "physical and mental limitations that affect what [that person] can do in a work setting"); *Presnell v. Colvin*, No. 1:12-CV-299-FDW, 2013 WL 4079214, at *4 (W.D.N.C. Aug. 13, 2013) (emphasizing that "[c]onsideration does not require favorable consideration" and rejecting the plaintiff's argument that the ALJ had failed to consider his non-severe mental impairments where the ALJ "determined in step three that Plaintiff's mental impairments were non-severe, and as a result, concluded that they caused little or no functional limitation which would impact the ALJ's analysis of [the plaintiff's] RFC"). Lastly, an ALJ "need only include in the RFC those limitations which he finds credible." *Garrett v. Comm'r of Soc. Sec.*, 274 Fed. Appx. 159, 163 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000)); *see also* 20 C.F.R. § 404.1529(c)(4) (noting that the SSA will consider a claimant's reported symptoms, but will only find that they actually diminish RFC "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms ... can reasonably be accepted as consistent with the objective medical evidence and other evidence"). Although the ALJ considers all relevant evidence—medical, observational, and subjective—the determination of a claimant's RFC is ultimately an administrative assessment that falls within the province of the ALJ as the representative of the Commissioner. *Id.* § 404.1527(d)(2); *see also Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The reviewing court's sole responsibility when assessing an ALJ's finding of a claimant's RFC, as it is with all ALJ findings, is to determine whether the ALJ's conclusion is consistent with the governing legal principles, is rational, and is supported by substantial evidence. *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

      Here, as previously discussed, the ALJ conducted a careful analysis, applying

the special technique to evaluate Claimant's degree of functional limitations from her mental impairments; in doing so, the ALJ considered Claimant's self-reports, treatment records, and the consultative findings and opinions. Ultimately, the ALJ determined that Claimant's mental impairments were non-severe and did not cause more than a minimal limitation in her ability to perform basic work like activities. (Tr. at 335, Finding No. 3). The ALJ recognized, however, that this severity determination was not an RFC assessment and, before beginning that RFC assessment, took care to note that "the following residual capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis." (*Id.*)

It is apparent from the discussion following the step two finding that the RFC determination ultimately included no limitation to account for Plaintiff's non-severe mental health impairments. The ALJ explained that the record evidence did not support such limitations, and claimant's statements to the contrary were not consistent with the evidence. The ALJ indicated that "claimant's statements concerning her impairments and their impact on her ability to work are not entirely credible in light of the claimant's own description of her activities and lifestyle, the degree of medical treatment required, discrepancies between the claimant's assertions and information contained in documentary reports, the medical history, the findings made on examination, the claimant's assertions concerning her ability to work, and the reports of the reviewing, treating and examining practitioners." (Tr. at 339-40). Plaintiff does not challenge this credibility determination.

In the written decision, the ALJ discussed Claimant's mental health records in detail, pointing out that later records from January 2014 showed that Claimant had no severe abnormalities or limitations in memory, orientation, attention, cognition,

speech, mood, and overall appearance. (Tr. at 337, 339). The ALJ further observed that Claimant was able to perform a wide range of daily activities and, although she later claimed a reduction in daily activities, she was still able to perform basic activities without significant assistance. (*Id.*). The ALJ also considered Claimant's work history, finding that Claimant's sporadic work history raised a question as to whether her continued unemployment was indeed related to the alleged impairments, or was due to some other reason. (*Id.*). With respect to opinion evidence, the ALJ noted that state agency psychologists found no more than mild limitations in activities of daily living; no limitations in social functioning or concentration, persistence, or pace; and no evidence of episodes of decompensation of extended duration. (Tr. at 340). Further, the ALJ evaluated Ms. Bell's findings, acknowledging that while Claimant had a full scale IQ of 79 on Ms. Bell's tests, the cognitive testing essentially reflected average mental functioning with no severe deficiencies in memory, judgment, orientation, attention, repetition, and comprehension. (Tr. at 340). The ALJ interpreted Ms. Bell's statements as corroboration that Claimant had no more than mild deficits. (Tr. at 341).

Thus, the ALJ's RFC discussion demonstrates that she considered Claimant's non-severe mental impairments in assessing Claimant's RFC. The ALJ was not required to specifically detail why Claimant's cognitive disorder did not warrant further restrictions in Claimant's RFC assessment (such a limitation to "simple repetitive type 2-3 step tasks") when the ALJ's rationale was clear, starting with her severity assessment at step two of the process. The ALJ's extensive discussion of the evidence at step two and her further discussion of the evidence in assessing Claimant's RFC, combined with her conclusion that Claimant's subjective statements were inconsistent with the medical and opinion evidence and the Claimant's own self-

reports of daily living, were more than sufficient to demonstrate that the ALJ considered Claimant's non-severe impairments when assessing her RFC. *See Kins v. Comm'r of Soc. Sec.*, Civil Action No. 3:14-CV-86, 2015 WL 1246286, at *23–24 (N.D. W. Va. Mar. 17, 2015) (finding that the ALJ properly considered a nonsevere impairment, despite not explicitly addressing it in the RFC section of the decision, where the ALJ elsewhere "made specific findings and provided an explanation for her conclusion that [the non-severe impairment] resulted in only minimal functional limitations"); *Brooks v. Astrue*, Civil Action No. 5:10cv00104, 2012 WL 1022309, at 11–12 (W.D. Va. Mar. 26, 2012) (finding ALJ consideration of non-severe impairments sufficient, despite not including any limitations to account for such impairments in the RFC, where the ALJ expressly considered the relevant medical evidence and compared them to plaintiff's subjective complaints about the limiting effects of her impairments, but "simply did not find any additional limitations were warranted in light of these impairments" (citation omitted)).

In consideration of all of the above, the undersigned **FINDS** that the ALJ's decision to not include any restrictions related to Claimant's mental impairments in her RFC finding is supported by substantial evidence. The ALJ was not required to adopt the opinions of Ms. Bell or the state agency psychologists in their entirety. To the extent that any variation exists between the ALJ's conclusions and the consultative examiners findings, the ALJ's rationale is evident from her decision that the years of medical records, Claimant's self-reports, and other evidence indicated that Claimant's mental impairments had an insignificant impact on her ability to work. As is plain from the ALJ's decision, she weighed all of the evidence, including the treatment records, opinion evidence, and Claimant's statements, and her discussion of the evidence

created a logical nexus between the evidence and the RFC finding.

In regard to Claimant's argument that the RFC finding should have at least contained a restriction to "simple repetitive type 2-3 step tasks," the lack of such a restriction was, at most, harmless error. A review of other cases in this circuit confirms that Claimant could perform all of the jobs identified by the vocational expert (marker, counter clerk, and assembler) even with such limitation. *See, e.g., Rodgers v. Colvin*, No. 5:13-CV-345-D, 2015 WL 636061, at *6 (E.D.N.C. Feb. 13, 2015) (vocational expert testimony that someone restricted to "simple, routine, repetitive tasks, low-production, low-stress environment, and no complex decision-making, constant change, or dealing with crisis situations" could work as a merchandise price marker); *Ransome v. Colvin*, No. 4:12-CV-253-FL, 2014 WL 237510, at *4 (E.D.N.C. Jan. 22, 2014) (vocational expert testimony that someone capable of only unskilled, simple, routine, repetitive in nature work could work as a counter attendant); *McKay v. Colvin*, No. CIV.A. 3:12-1601, 2013 WL 3282928, at *14 (S.D.W. Va. June 27, 2013) (vocational expert testimony that someone who is limited to "routine one and two step tasks in a low stress setting" can work as an assembler). The unskilled jobs listed by the vocational expert were uniformly described in the Dictionary of Occupational Titles ("DOT") as requiring a reasoning level of two. Such jobs are consistent with someone who is limited to simple, routine tasks. *See, e.g., Meissl v. Barnhart*, 403 F.Supp.2d 981, 984 (C.D.Cal.2005) (a plaintiff limited to "simple, routine, repetitive tasks" was capable of performing jobs at the DOT reasoning level of two); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir.2005) (holding that "level-two reasoning appears more consistent with plaintiff's RFC" to "simple and routine tasks"); *Money v. Barnhart*, 91 F. App'x 210, 214, 2004 WL 362291, at *3 (3d Cir. 2004)("Working at

34

reasoning level 2 would not contradict the mandate that the work be simple, routine and repetitive"); *see generally Charles v. Astrue,* No. 07–1172, 2008 WL 4003651, at *4 (W.D. La Aug. 7, 2008) (collecting cases holding reasoning two level is consistent with an RFC to perform simple, routine tasks.)

In summary, even assuming that the ALJ erred in not restricting Claimant's RFC to "simple repetitive type 2-3 step tasks," which, to be clear, the undersigned finds was not the case, the error would be harmless as it would not have altered the disability determination. *See Tanner v. Comm'r of Soc. Sec.*, 602 F. App'x 95, 101 (4th Cir. 2015) (finding an ALJ's error to be harmless where it was "highly unlikely, given the medical evidence of record, that a remand to the agency would change the Commissioner's finding of non-disability"); *Molina v. Astrue,* 674 F.3d 1104, 1115 (9th Cir. 2012) ("[A]n ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination." (quotation marks omitted)); *Huffman v. Colvin,* No. 1:10CV537, 2013 WL 4431964, at *4 (M.D.N.C. Aug. 14, 2013) ("[E]rrors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error."); *cf. Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

Accordingly, for all of the reasons stated above, the undersigned **FINDS** that the ALJ properly assessed Claimant's cognitive disorder at the relevant steps of the disability determination process and the ALJ's ultimate decision that Claimant was not disabled under the Act is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 10); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 11); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** September 16, 2016

Cheryl A. Eifert
United States Magistrate Judge

37